STATE OF WEST VIRGINIA, *ex rel.* GILBERT HARRIS, *A Minor,*

PROCEEDING BY HIS NEXT FRIEND EMMA BURROWS

*v.*

CALVIN A. CALENDINE, COMMISSIONER OF PUBLIC

INSTITUTIONS FOR THE STATE OF WEST VIRGINIA, SUCCEEDED

BY STEWART WERNER; ROBERT J. KLEIN *Superintendent,*

DAVIS CENTER FOR BOYS

(No. 13815)

Decided March 22, 1977.

*Charles R. Garten, Jr.* for relator.

*Chauncey H. Browning,* Attorney General, *Betty L. Caplan,* Assistant Attorney General, for respondents.

NEELY, JUSTICE:

This habeas corpus proceeding calls into question the constitutional validity of West Virginia's classification and disposition of juvenile offenders. The Court does not find unconstitutional *W. Va. Code,* 49-1-4 (1941), which defines a "delinquent child," or *W. Va. Code,* 49-5-11 (1975), which authorizes certain methods of disposition for children adjudged delinquent; nevertheless, we find that definite guidelines are needed to prevent these statutes from being unconstitutionally applied in violation of *West Virginia Constitution,* Art. III, § 10, the due process clause, and *West Virginia Constitution,* Art. III, § 5, the cruel and unusual punishment clause.

The petitioner, Gilbert Harris, is a 16 year old boy now confined in the Davis Center, a forestry camp for boys, pursuant to an order of the Calhoun County Juvenile Court adjudging the petitioner delinquent because he had been absent from school for 50 days.

On April 9, 1976, the Director of Supportive Services for the Calhoun County Board of Education petitioned the juvenile court to find Mr. Harris either neglected or delinquent because of his irregular school attendance. A summons was served on petitioner's mother and stepfather stating that they were required to appear before the Calhoun County Juvenile Court, and after several

continuances a hearing was finally held on May 17, 1976 at which the petitioner, his attorney, and petitioner's mother appeared. At the hearing the petitioner did not deny the allegations against him and was adjudicated a delinquent child. The juvenile court committed the petitioner to the care, custody, and control of the Commissioner of Public Institutions for the State of West Virginia for assignment to the Industrial School for Boys at Pruntytown until the petitioner became 16 years old in July 1976. Upon reaching age 16, petitioner was to be reassigned to a Youth Center for the balance of a one year period, after which he was to be remanded to the custody of the Calhoun County Juvenile Court. Petitioner had never been charged with a delinquent act before the bringing of the petition now under review and had never previously appeared before the juvenile court. Furthermore, petitioner was nearly 16 at the time he was adjudged delinquent for truancy, and he was ordered incarcerated for almost a year past the legal age when school attendance is required. *W. Va. Code*, 18-8-1 (1951).

Petitioner lived in a remote, rural section of Calhoun County and had some difficulty getting to school during the winter months. More importantly, however, it appears that the petitioner was ridiculed and shunned by his classmates because he suffered from a facial disfigurement and was mildly retarded. Petitioner had been enrolled in a special education class during junior high school and high school, but the record does not disclose any details about those classes in the local schools or the programs offered by either the industrial school at Pruntytown or the Forestry Camp at Davis.

In support of his petition, petitioner alleges that he was not afforded adequate and sufficient notice of the charges against him; that the commitment is null and void because the petition filed against him was fatally defective for failing to set forth specific facts constituting neglect or delinquency; that the proceeding in the juvenile court was void because his parents did not have legal counsel at the hearing; that the trial judge abused

his discretion in committing him to incarceration beyond the period during which he was required to attend school; and, that the entire juvenile commitment procedure violates the due process clauses, and the cruel and unusual punishment clauses of the State and Federal constitutions. The Attorney General of West Virginia confessed error in this proceeding and, consequently, there is no record before us.

The absence of a detailed record necessarily limits our review of the alleged procedural irregularities. Accordingly we confine ourselves in this opinion to reaffirming that a juvenile defendant in a delinquency proceeding is entitled to counsel who will represent and defend him both at trial and on appeal, and that his parents, guardians or other custodians are entitled to be informed that their child has a right to counsel. *W. Va. Code*, 49-5-10 (1975). An indigent defendant has a right to court appointed counsel, *Code*, 49-5-10 (1975), and all parties, particularly parents, guardians, or other custodians must be fully and meaningfully informed of their rights and must be accorded a reasonable time to confer with counsel and prepare a defense. Furthermore, any delinquency petition must allege sufficiently specific underlying facts to give the defendant and his parents, guardians, or other custodians fair notice of the charges against the defendant. *State ex rel. Wilson v. Bambrick*, 156 W. Va. 703, 195 S.E.2d 721 (1973); *Crow v. Coiner*, 323 F. Supp. 555 (N.D. W. Va. 1971); *In re Gault*, 387 U.S. 1 (1967).

As we decide this case on the basis of the Constitutional issues fairly raised in the petition, we need not reach the question of whether the trial judge abused his discretion in confining petitioner beyond the age at which school attendance is required.

I.

The primary question presented by this proceeding is whether *W. Va. Code*, 49-1-4 (1941) and *W. Va. Code*, 49-5-11 (1975) establish methods for handling juvenile offenders which are inherently unconstitutional. These West

Virginia statutes, which indiscriminately combine status offenders[1] with criminal offenders, present an enormous potential for abuse and unconstitutional application. Nonetheless, under the doctrine of the least obtrusive remedy, this Court will avoid striking down legislation whenever ". . . there is an adequate remedy to prevent such legislation from being unconstitutionally applied." Point 4, Syllabus, *State ex rel. Alsop v. McCartney*, ___ W. Va. ___, 228 S.E.2d 278 (1976). To save these statutes from constitutional infirmity and to assure that they will be constitutionally applied, this Court will discuss the perimeters dictated by the *Constitution of the State of West Virginia* which circumscribe their application.

*W. Va. Code*, 49-1-4 (1941) establishes the conditions under which a child may be adjudicated delinquent. That Section provides:

'Delinquent child' means a person under the age of eighteen years who:

(1) Violates a law or municipal ordinance;

(2) Commits an act which if committed by an adult would be a crime not punishable by death or life imprisonment;

(3) Is incorrigible, ungovernable, or habitually disobedient and beyond the control of his parent, guardian, or other custodian;

(4) Is habitually truant;

(5) Without just cause and without the consent of his parent, guardian, or other custodian, repeatedly deserts his home or place of abode;

(6) Engages in an occcupation which is in violation of law;

---

[1] A status offender, for the purposes of this opinion, may be defined as a child who "is beyond the control of his parents or is engaging in non-criminal conduct thought to be harmful to himself . . ." M. Paulsen and C. Whitebread, *Juvenile Law and Procedure* 32 (1974), or who commits acts, which if committed by an adult, would not be crimes.

(7) Associates with immoral or vicious persons;

(8) Frequents a place the existence of which is in violation of law;

(9) Deports himself so as to wilfully injure or endanger the morals or health of himself or others.[2]

Once a child has been adjudicated delinquent the methods of court disposition are set forth by *W. Va. Code*, 49-5-11 (1975) which provides as follows:

With a view to the welfare and interest of the child and of the State, the court or judge may, after the proceedings, make any of the following dispositions:

(1) Treat the child as a neglected child, in which case the provisions of article six [§ 49-6-1 *et seq.*] of this chapter shall apply;

(2) Order the child placed under the supervision of a probation officer;

(3) If the child be over sixteen years of age at the time of the commission of the offense the court may, if the proceedings originated as a criminal proceeding, enter an order showing its refusal to take jurisdiction as a juvenile proceeding and permit the child to be proceeded against in accordance with the laws of the State governing the commission of crimes or violation of municipal ordinances;

(4) Commit the child to an industrial home or correctional institution for minors;

(5) Commit the child to any public or private institution or agency permitted by law to care for children;

---

[2] "Subsections 7 and 9 of *Code*, 49-1-4, (1931) as amended, defining a delinquent child as one who '[a]ssociates with immoral or vicious persons' and as one who '[d]eports himself so as to wilfully injure or endanger the morals or health of himself or others' are void as violative of the Due Process Clause of art. III, § 10 of the *Constitution of West Virginia* and the Fourteenth Amendment of the *Constitution of the United States*." Point 6, Syllabus, *State v. Flinn*, ___ W. Va. ___, 208 S.E.2d 538 (1974).

(6) Commit the child to the care and custody of some suitable person who shall be appointed guardian of the person and custodian of the child;

(7) Enter any other order which seems to the court to be in the best interest of the child.

Both of these statutes must be interpreted and applied in conformity with *West Virginia Constitution*, Art. III, § 10, which provides "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers" and *West Virginia Constitution*, Art. III, § 5, which provides in part, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted. . ."

Inherent in the due process clause of the State Constitution are both the concept of substantive due process and the concept of equal protection of the laws.[3] In order for the statutory scheme concerning juvenile delinquents to withstand consitutional scrutiny under the substantive due process standard, it must appear that the means chosen by the Legislature to achieve a proper legislative purpose bear a rational relationship to that purpose and are not arbitrary or discriminatory.[4] Fur-

---

[3] In the continuously evolving tradition of Anglo-American common law there can be no fixed definition of due process of law, which is an inherently elusive concept; nevertheless, it is apparent that due process of law under the *West Virginia Constitution* contains an equal protection component the scope and application of which are coextensive or broader than the equal protection clause of the Fourteenth Amendment to the *United States Constitution*. *See, Johnson v. Robison*, 415 U.S. 361 (1974) which imports the equal protection clause of the Fourteenth Amendment into the Fifth Amendment to the *United States Constitution*, the due process language of which is nearly identical to that found in *West Virginia Constitution*, Art III, § 10. *See also, Linger v. Jennings*, 143 W. Va. 57, 99 S.E.2d 740 (1957), which strongly suggests that *West Virginia Constitution*, Art. III, § 10 affords West Virginia citizens a guarantee of equal protection of the laws as a matter of State constitutional doctrine.

[4] While the substantive due process requirements of the *United States Constitution* have been subject to some erosion, *see Ferguson v. Skrupa*, 372 U.S. 726 (1963), the concept of substantive due

thermore, under the equal protection standard it must appear that the statutes do not invite invidious discrimination based on race, color, creed, sex, national origin, or social class.

The cruel and unusual punishment standard requires that no person be punished unless he has done something which is generally recognized as deserving of punishment. Furthermore, as we implied in *State ex rel. Hawks v. Lazaro*, 157 W. Va. 417, 202 S.E.2d 109 (1974), the state cannot punish a person in fact while alleging to rehabilitate or otherwise help him.

The statutes under consideration, in the absence of guidelines for their application, fail to meet the equal protection, substantive due process, and the cruel and unusual punishment standards because they permit the classification and treatment of status offenders in the same manner as criminal offenders.

## II.

We are not concerned with whether a child may be committed to a state correctional facility such as Pruntytown or the Davis Center when, in the language of subsections 1 and 2 of *Code*, 49-1-4 (1941), the child either violates a law or municipal ordinance or commits an act which if committed by an adult would be a crime not punishable by death or life imprisonment. These subsections provide for both punishment and rehabilita-

---

process within the *United States Constitution* is still alive. *See, Roe v. Wade*, 410 U.S. 113 (Stewart, J. concurring) (1973); *Rouse v. Cameron*, 373 F.2d 451 (D.C.Cir. 1966); *Wyatt v. Stickney*, 325 F. Supp. 781 (D.C.Ala. 1971). In any event, substantive due process remains a viable concept under *West Virginia Constitution*, Art. III, § 10, and in evaluating whether statutes meet substantive due process requirements, a West Virginia court must adhere to the following basic standard: "... to satisfy the requirements of due process of law, legislative acts must bear a reasonable relationship to a proper legislative purpose and be neither arbitrary or discriminatory." Syllabus Point 1, *State v. Wender*, 149 W. Va. 413, 141 S.E.2d 359 (1965). *See also, State ex rel. Hawks v. Lazaro*, 157 W. Va. 417, 202 S.E.2d 109 (1974).

tion of those children who commit criminal acts which have long been recognized at common law.

˙ We are, however, concerned with incarceration of children for status offenses. Particularly in the language of subsections 3 through 6 and subsection 8 of *Code*, 49-1-4 (1941) we are concerned with a child who is incorrigible, ungovernable, habitually disobedient and beyond the control of his parents, truant, repeatedly deserts his home or place of abode, engages in an occupation which is in violation of law, or frequents a place the existence of which is in violation of law. The Legislature has vested the juvenile court with jurisdiction over children who commit these status offenses so that the court may enforce order, safety, morality, and family discipline within the community. The intention of the law is laudable; however, the means employed to accomplish these ends are unconstitutional insofar as they result in the commitment of status offenders to secure, prison-like facilities which also house children guilty of criminal conduct, or needlessly subject status offenders to the degradation and physical abuse of incarceration.

At the outset the Court should make clear that we are not impressed with euphemistic titles used to disguise what are in fact secure, prison-like facilities.[5] We define a secure, prison-like facility, regardless of whether it be called a "home for girls," "industrial school," "forestry camp," "children's shelter," "orphanage," or other imaginative name, as a place which relies for control of children upon locked rooms, locked buildings, guards, physical restraint, regimentation, and corporal punishment. Somehow, it appears to us that if the State's purpose is to develop a society characterized by peace and love, that our institutions for children should reflect those qualities and not their opposite. In fact, as we shall develop shortly, the status offender has a constitu-

---

[5] Shakespeare instructs us well that merely changing the name of an object does not change its true character:

"What's in a name? that which we call a rose By any other name would smell as sweet." *Romeo and Juliet*, Act II, Sc. ii.

tional right, if not to love, at least to the absence of
hate.

*W. Va. Code*, 49-5-11 (1975) provides a number of meth-
ods of disposition for juvenile offenders, including plac-
ing the delinquent child under supervised probation,
committing the child to a public or private institution or
agency, committing the child to the care and custody of
some suitable person, entering any other order which
would appear to be in the best interest of the child, and
then finally committing the child to an industrial home
or correctional institution for minors, *i.e.*, a secure,
prison-like facility. It is parsimony which circumscribes
our courts' ability to treat status offenders constitution-
ally, not the absence of statutory authority.

### *The Equal Protection Standard*

We find that with regard to the status offender the
procedure for disposition set forth in *Code*, 49-5-11 (1975)
can be applied in a manner repugnant to the basic prin-
ciples of equal protection because it discriminates invidi-
ously against children based upon social class, sex, and
geographic location. It is obvious that a child from a
family with financial resources will have an opportunity
to use private institutional facilities which are far less
restrictive, less dangerous, and less degrading than pub-
lic correctional institutions. What would have happened
to the petitioner in the case before us if he had come
from an upper middle-class family in a city such as
Charleston or Wheeling? He certainly would have had an
opportunity to go to a private school. In the case before
us we may reasonably infer that the Calhoun County
Juvenile Court committed petitioner to a reform school
because of the lack of a reasonable alternative which
would have existed if petitioner had been from a differ-
ent area or belonged to a different socio-economic class.

Furthermore, the status offender is inherently in a
different class from the criminal offender. The Legisla-
ture could choose to punish children guilty of criminal
conduct in the same manner as it punishes adults, but

as a matter of public policy the Legislature provided instead for a comprehensive system of child welfare. The aim of this system is to protect and rehabilitate children, not to punish them. *See, State ex rel. Slatton v. Boles*, 147 W. Va. 674, 130 S.E.2d 192 (1963); *State ex rel. Browning v. Boles*, 147 W. Va. 878, 132 S.E.2d 505 (1963). It has always been assumed that the Legislature can at any time withdraw some or all the benefits of this system from children guilty of criminal conduct. There is no such prospect for status offenders, however, since without the child welfare legislation they are guilty of no crimes cognizable and punishable by courts. This explains why status offenders have a special position within the current system, despite the fact that technically they are not distinguished from children guilty of actual criminal conduct. Since the class to which status offenders belong has been created under authority of the State's inherent and sovereign *parens patriae* power, *Warner Bros. Pictures v. Brodel*, 179 P.2d 57 (Cal. App. 1947), *Johnson v. State*, 18 N.J. 422, 114 A.2d 1 (1955), and not under the plenary powers of the State to control criminal activity and punish criminals, *Barker v. People*, 3 Cow. (N.Y.) 686 (1824), status offenders must be treated in a fashion consistent with the *parens patriae* power, namely, they must be helped and not punished, *State ex rel. Slatton v. Boles, supra;* otherwise their classification becomes invidious, and accordingly, unconstitutional.

Finally, it should be noted that status offender legislation discriminates invidiously against females. It is apparent that status offense petitions can easily be used to bring under control young women suspected by their parents or by other authorities of promiscuous behavior. Our society tends to condemn female promiscuity more severely than male promiscuity, and this tendency may explain why females often are unfairly classified and treated as status offenders. This Court offers no explanation for this phenomenon, nor do we make any normative judgments regarding the wisdom of such a distinction; however, we recognize its existence and its

discriminatory effect on female status offenders.[6] The control of sexual behavior may be accomplished by other means.

### The Substantive Due Process Standard

Furthermore the Court finds no rational connection between the legitimate legislative purposes of enforcing family discipline, protecting children, and protecting society from uncontrolled children, and the means by which the State is permitted to accomplish these pur-

---

[6] A recent study (December 1976) by the Division of Corrections, West Virginia Department of Public Institutions, indicates that female status offenders comprise a much larger percentage of the total number of their sex committed to secure, prison-like facilities than male status offenders comprise of theirs. This study identified 138 status offenders out of the total number of 477 children committed at that time to West Virginia's secure, prison-like facilities. Overall then, 29% of the children committed were status offenders.

There were 404 males in the sample population, of whom 72 were status offenders, or approximately 18%. On the other hand there were 73 females in the sample population, of whom 66 were status offenders, or approximately 90%.

The study provides additional evidence of the uneven treatment of females. Of the 72 males committed for status offenses, 41, or about 57%, had a prior history of criminal conduct. Although this prior history by itself would be insufficient, under the guidelines of this opinion, to justify the commitment of these male status offenders to secure, prison-like facilities, the figures do suggest that juvenile courts are giving some attention to the severity of male status offenders' behavioral problems before committing them to secure, prison-like facilities. On the other hand, only 12, or about 18%, of the 66 females committed for status offenses had a history of prior criminal conduct.

The inequities of the present commitment process are all the more alarming because male and female status offenders are being referred to juvenile courts in approximately equal numbers. According to the West Virginia Department of Welfare statistics, 1974 referrals for status offenses were divided 48% males, 52% females; 1975 referrals for status offenses were divided 47% males, 53% females; and 1976 referrals were 49.7% males, 50.3% females. Therefore, it appears that the present system manifests its sexual bias not in the mere referral of status offenders to the authorities, but rather in the failure to accord even-handed treatment at the stage where a determination is made to commit status offenders to secure, prison-like facilities.

poses, namely incarceration of children in secure, prison-like facilities.

It is generally recognized that the greatest colleges for crime are prisons and reform schools.[7] The most egregious punishment inflicted upon a child incarcerated in a West Virginia penal institution is not the deprivation of his liberty but rather his forced association with reprehensible persons. Prisons, by whatsoever name they may be known, are inherently dangerous

---

[7] Among others, The United States Senate Judiciary Subcommittee to Investigate Juvenile Delinquency has recognized that juvenile penal institutions provide novice criminals a rich education in the ways of crime. The Chairman of the Subcommittee, the Honorable Birch Bayh, noted the particular folly of allowing status offenders to receive an education in crime at public expense: ". . . I have heard testimony from countless juveniles who have been incarcerated for acts which would not have been crimes for adults, and who have emerged from institutions embittered and highly sophisticated in the ways of crime." Bayh, *Juveniles and the Law: An Introduction*, 12 Am. Crim. L. Rev. 1 (1974). *See also Hearings on Juvenile Detention Before the Subcomm. to Investigate Juvenile Delinquency of the Senate Comm. on the Judiciary*, 93 Cong. 1st Sess. (unpublished); *Hearings on Juvenile Confinement Institutions and Correctional Systems Before the Subcomm. to Investigate Juvenile Delinquency of the Senate Comm. on the Judiciary*, 92 Cong., 1st Sess. (1971); *President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Juvenile Delinquency and Youth Crime* (1967).

In an effort to remedy the serious problems documented before his subcommittee, Senator Bayh, along with Senator Marlow Cook, introduced in Congress the Juvenile Justice and Delinquency Prevention Act. Passed in 1974 as Public Law 93-415, this act is in part concerned with the exposure of status offenders in juvenile correctional institutions to other juveniles guilty of criminal conduct. In response to this particular problem Congress has by law provided financial incentives to states and localities which are willing to remove status offenders from juvenile detention or correctional facilities and place them in shelter facilities or community based treatment programs. *See*, 42 U.S.C. § 5601, *et seq.*

For a concurring view of the problem of common custody, *see The Report of the California Assembly Interim Committee on Criminal Procedure, Juvenile Justice Processes* (1974) at 14 which states that ". . . if any of them [status offenders] were ever on the verge of committing a criminal act, they have been brought to the right place [i.e. joint custody with juvenile delinquents] for a final push."

places. Sexual assaults, physical violence, psychological abuse and total degradation are the likely consequences of incarceration. If one hopes to find rehabilitation in a penal institution, his hopes will be confounded.

This Court held in the case of *State ex rel. Hawks v. Lazaro, supra,* that the doctrine of *parens patriae* "has been suspect from the earliest times" and that when the State is proceeding under color of its *parens patriae* authority, it must actually have fair prospects of achieving a beneficient purpose, otherwise the reason for the authority fails. *Hawks, supra,* concerned the constitutional validity of West Virginia's mental health commitment statutes which this Court found to be violative of due process. In *Hawks* this Court subjected the State's incarceration of the mentally ill to a substantive due process test. The Court said at 202 S.E.2d 120:

> "The theoretical beneficence of the State with regard to its citizens has been used in justification of state custody or guardianship from the medieval period to our own day, although the disparity between the theory of beneficence and the practice of cruelty and inhumanity has often been the subject of literature (*see,* Dickens, *Oliver Twist;* Bronte, *Jane Eyre.*) There is persuasive evidence that the alleged improvement in treatment in modern state facilities from medieval times to our own is more myth than reality, *see, Wyatt v. Stickney,* 325 F. Supp. 781 (D.C.Ala. 1971) and that at the current low level of sociological and psychological knowledge, combined with the current parsimonious level of governmental support for state institutions, the state and its officers have a limited therapeutic role and a predominantly custodial role.

> In recognition of the conditions which exist at state institutions, numerous courts have recently required the state to demonstrate a reasonable relationship between the alleged harm which a person is likely to do to himself and the treatment designed to ameliorate the illness which may cause that harm. For example, in *Darnell v.*

*Cameron*, 121 U.S.App.D.C. 58, 348 F. 2d 64 (1965) the Court stated that mandatory confinement rests upon the supposition of the necessity for treatment, and that if there is no treatment, a committed individual can bring a *habeas corpus* proceeding to question the constitutionality of his involuntary hospitalization; also, in *Medberry v. Patterson*, 188 F. Supp. 557 (D.C., Colo. 1960) the Court held that an involuntarily committed patient is entitled to treatment and lack of such treatment cannot be justified by a lack of staff or facilities. Accordingly the ancient doctrine of *parens patriae* is in full retreat on all fronts except in those very narrow areas where the state can demonstrate, as a matter of fact, that its care and custody is superior to any available alternative. *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L.Ed.2d 527 (1967); *In re Simmons Children*, 154 W. Va. 491, 177 S.E.2d 19 (1970); *In re Willis*, W. Va. (decided December 11, 1973). Therefore, in determining whether there is any justification under the doctrine of *parens patriae* for deviation from established due process standards, it is appropriate for this Court to consider that the State of West Virginia offers to those unfortunates who are incarcerated in mental institutions Dickensian squalor of unconscionable magnitudes."

We apply the same substantive due process standards to the commitment of children for status offenses, since such commitment has always been justified on the same *parens patriae* grounds as commitment of the mentally ill.[8] In theory, the commitment of the mentally ill has

---

[8] Further support for this Court's application of substantive due process analysis to West Virginia's status offender legislation can be found in the interesting history of New York's statutes on Persons in Need of Supervision (PINS). PINS in New York comprise a category of juvenile offenders functionally equivalent to West Virginia's status offenders.

An early and successful challenge to New York's PINS scheme was mounted in *Martarella v. Kelly*, 349 F. Supp. 575 (S.D.N.Y. 1972). In *Martarella* members of a group alleged or adjudicated to be PINS sought declaratory and injunctive relief against New York

been to protect them from themselves as well as to protect society from their actions. Essentially the same rationale exists for commitment of juvenile status offenders. That is, they must not be permitted to injure themselves, and society must protect itself from their actions. We find with regard to status offenders the

officials to establish the unconstitutionality of holding PINS in secure detention with juvenile offenders guilty of criminal activity, while not affording PINS appropriate treatment. Plaintiffs based their claim that common custody of PINS and juvenile delinquents was unconstitutional primarily on the equal protection clause. Their equal protection argument was that neglected children in New York were housed separately from juvenile delinquents, and that PINS ought likewise to be housed separately. Also, plaintiffs argued that common custody was irrational under the due process clause and amounted to cruel and unusual punishment. These constitutional challenges failed, even though the trial judge implied that he found "more persuasive the view of the experts who strongly favor separation of PINS and [juvenile delinquents]" *Id.* at 596.

Plaintiffs did, however, succeed on their claim that failure to afford them treatment was unconstitutional. Although the trial judge, in reviewing the authorities, suggested that the right to treatment could derive from the equal protection or cruel and unusual punishment clauses, he based his holding primarily on the concept of substantive due process. He stated that "In sum, the law has developed to a point which justifies the assertion that:

'A new concept of substantive due process is evolving in the theraputic realm. This concept is founded upon a recognition of the concurrency between the state's exercise of sanctioning power and its assumption of the duties of social responsibility. Its implication is that effective treatment must be the *quid pro quo* for society's right to exercise its *parens patriae* controls. Whether specifically recognized by statutory enactment or implicity derived from the constitutional requirements of due process, the right to treatment exists.'" *Id.* at 600.

The next case in this line was *C. v. Redlich*, 32 N.Y.2d 588, 347 N.Y.S.2d 51, 300 N.E.2d 424 (1973), in which Chief Judge Fuld, writing for a unanimous New York Court of Appeals, held that PINS could not validly be confined in state training schools along with juvenile delinquents. Although the holding was in part based upon interpretation of New York's statutes, it did in larger part stem from a substantive due process analysis. Chief Judge Fuld noted "as might be expected, the practice [of confining PINS with juvenile delinquents] has been severely condemned." *Id.* at 425.

The *C. v. Redlich* holding was squarely reaffirmed in *Lavette M. v. Corporation Counsel of City of N.Y.*, 35 N.Y.2d 136, 359 N.Y.S.2d 20,

same fact we found in *Hawks, supra,* with regard to the mentally ill, that the State means, namely incarceration in secure, prison-like facilities, except in a limited class of cases, bears no reasonable relationship to legitimate State purposes, namely, rehabilitation, protection of the children, and protection of society.

In view of the foregoing, and in view of the fact that there are numerous alternatives to incarceration for status offenders[9] we hold that the State must exhaust every reasonable alternative to incarceration before committing a status offender to a secure, prison-like facility. Furthermore, for those extreme cases in which commitment of status offenders to a secure, prison-like

---

316 N.E.2d 314 (1974) with emphasis on the issue of common custody: "... the confinement of PINS children in a prison atmosphere along with juveniles convicted of committing criminal acts ... is proscribed, and not the fact alone of placement in a training school." *Id,* at 316.

In a later case, another group of PINS brought a suit under 42 *U.S.C.* § 1983 challenging their confinement in rural New York training schools. After the federal district court abstained, the case was appealed to the United States Court of Appeals, Second Circuit, which held the abstention to be improper. *McRedmond v. Wilson,* 533 F. 2d 757 (2d Cir. 1976). The *McRedmond* court acknowledged that New York's own courts had subjected the PINS statute to substantive due process analysis, and referred expressly to *C. v. Redlich,* 32 N.Y.2d 588, 347 N.Y.S.2d 51, 300 N.E.2d 424, (1973) and *Lavette M. v. Corporation Counsel of City of N.Y.,* 35 N.Y.2d 136, 359 N.Y.S.2d 20, 316 N.E.2d 314 (1974) as such cases. *McRedmond v. Wilson, supra,* at 762.

[9] Such alternatives include, but are not limited to, supervised probation, specialized foster care arranged through the Department of Welfare; non-secure, adequately supervised residential shelter facilities similar to the Children's Home Society, Wheeling and "Patchwork" in Charleston; a group home program, with structured live-in treatment, and access to counseling and psychiatric care, similar to the Davis-Stuart group homes in Bluefield, Princeton, Beckley and Fayetteville; residential treatment in a hospital setting for status offenders with psychological or emotional problems, similar to Opportunity Hall at Spencer State Hospital; and a residential center for intensive treatment outside the hospital setting, staffed by psychologists and medical professionals. Other satisfactory alternatives to incarceration could also be developed by a society solicitous of the welfare of its children and dedicated to treating the special problems of status offenders.

facility cannot be avoided, the receiving facility must be devoted solely to the custody and rehabilitation of status offenders. In this manner status offenders can be spared contact under degrading and harmful conditions with delinquents who are guilty of criminal conduct and experienced in the ways of crime.

However, this does not limit the authority of the juvenile court to house and educate status offenders and criminal offenders together in shelter homes, residential treatment centers, and other modern facilities staffed by well trained, attentive, and dedicated people, where the atmosphere is characterized by love and concern rather than physical violence, corporal punishment and physical restraint of liberty, provided the court determines there is no danger to the physical safety or emotional health of the status offender.

### The Cruel and Unusual Punishment Standard

In the case before us we are confronted with a child who was obviously in need of help, and yet the State chose to degrade him, to humiliate him, and to punish him by sending him to institutions which fail to meet his needs and cannot help him.

At the outset the Court acknowledges that the cruel and unusual punishment standard cannot easily be defined and certainly is not fixed; consequently, we feel the standard tends to broaden as society becomes more enlightened and humane. *See, State ex rel. Pingley v. Coiner*, 155 W. Va. 591, 186 S.E.2d 220 (1972). The standard ought to be especially broad in its application to status offenders, whom the State has pledged *not* to punish at all, but rather, to protect and rehabilitate. Furthermore, status offenders are not guilty of the criminal conduct which ordinarily serves to make society's exercise of the penal sanction legitimate.

A good starting point for applying the cruel and unusual punishment standard to West Virginia's treatment of status offenders is the concept of disproportionality. This concept is explicitly recognized in *West Virginia*

*Constitution*, Art. III, § 5, "Penalties shall be proportioned to the character and degree of the offense" and is implicit in the Eighth Amendment to the *United States Constitution*, which originates in the same tradition as our own constitutional provision. *See, Weems v. United States*, 217 U.S. 349 (1910), and *Ralph v. Warden*, 438 F. 2d 786 (4th Cir. 1970).[10] A recent federal case, overturning the application of West Virginia's habitual offender law to a particular defendant, discussed the concept of disproportionality and identified three objective factors which can be useful in determining whether certain punishment is constitutionally disporportionate. These factors are: (1) the nature of the offense itself; (2) the legislative purpose behind the punishment; and (3) what punishment would have been applied in other jurisdictions. *Hart v. Coiner*, 483 F.2d 136 (4th Cir. 1973).

As the preceding sections of this opinion have made clear, this Court is concerned with the class of offenders known as status offenders. By definition, the nature of the class of offenses committed by status offenders is non-criminal. Accordingly, the status offender is located on the extreme end of the spectrum of juvenile misconduct running from most serious to least serious offenses. The nature of their offense thus tends to indicate that status offenders incarcerated in secure, prison-like facilities, along with children guilty of criminal conduct, are suffering a constitutionally disproportionate penalty.

The second consideration, the legislative purpose behind the punishment, has already been discussed at length in the substantive due process section of this opinion. To reiterate, this court is unable to discern any

---

[10] Indeed, the concept of disproportionality can be traced back to the Magna Carta, Chapter 14 of which stipulated:

"A free man shall not be amerced for a trivial offense, except in accordance with the degree of the offense; and for a serious offense he shall be amerced according to its gravity . . . ."

This limitation on excessive and oppressive penalties was very likely the Magna Carta's most significant impact on the mass of the people at that time. *See Furman v. Georgia*, 408 U.S. 238 at 243 (1972).

rational connection between the legitimate legislative purposes of enforcing family discipline, protecting children, and protecting society from uncontrolled children and the incarceration of status offenders in secure, prison-like facilities along with children guilty of criminal conduct. We, like the court in *Hart v. Coiner, supra,* are in accord with Mr. Justice Brennan's observation: "If there is a significantly less severe punishment to achieve the purposes for which the punishment is inflicted, the punishment inflicted is unnecessary and therefore excessive." *Hart v. Coiner, supra* at 141.

Finally, we perceive that a "better rule" is emerging in other progressive jurisdictions, which eliminates or significantly limits the juvenile court's power to commit status offenders to secure, prison-like facilities along with children guilty of criminal conduct. New York's approach has been discussed in footnote 8 above. Other jurisdictions, typical of those which do not incarcerate status offenders in secure, prison-like facilities along with children guilty of criminal conduct, include Massachusetts and Maryland. *See, Massachusetts General Laws Annotated,* 119 § 39G [1973] and *Annotated Code of Maryland* § 3-832 [1973].[11] The nature of status offender punishment in other jurisdictions, which is by no means uniform, cannot, of course, control the outcome of this case. Nevertheless, in deciding in what direction an enlightened and humane society should move, this Court is entitled under *West Virginia Constitution,* Art. III, § 5 to consider the response of other jurisdictions to the common problem which is presented here.

---

[11] Of similar import are the recommendations of the National Conference of Commissioners on Uniform Laws. They propose that as to status offenders "the court may make any disposition authorized for a delinquent child except commitment to the state department or state institution to which commitment of delinquent children may be made." *Uniform Juvenile Court Act,* § 32. Alternatively, § 32 would permit commitment of status offenders along with delinquent children only when the status offender is found in a separate hearing not to be otherwise amenable to treatment and rehabilitation. *Id.*

For all of the foregoing reasons, we conclude that the incarceration of status offenders in secure, prison-like facilities along with children guilty of criminal conduct inflicts a constitutionally disproportionate penalty upon status offenders, and as such, violates *West Virginia Constitution*, Art. III, § 5.

### III.

Accordingly, we hold that a status offender may still be adjudged delinquent under *W. Va. Code*, 49-1-4 [1941]; however, before he may be committed to a penal institution pursuant to the provisions of *W. Va. Code*, 49-5-11(4) [1975], there must be evidence on the record which clearly supports the conclusion, and the juvenile court must specifically find as a matter of fact, that no other reasonable alternative either is available or could with due diligence and financial commitment on the part of the State be made available to help the child, and that the child is so totally unmanageable, ungovernable, and anti-social that he or she is amenable to no treatment or restraint short of incarceration in a secure, prison-like facility. Furthermore, to reiterate in this context what we said above, no status offender in any event, regardless of incorrigibility, may be incarcerated in a secure, prison-like facility which is not devoted exclusively to the custody and rehabilitation of status offenders. We emphasize here that State parsimony is no defense to an allegation of deprivation of constitutional rights. The State may not punish a person not deserving of punishment merely because such action serves the State's interest in convenience or frugality. *See Lavette M. v. Corporation Counsel of City of N. Y.*, 35 N.Y.2d 136, 359 N.Y.S.2d 20, 316 N.E.2d 314 (1974) and *Rouse v. Cameron*, 373 F.2d 451 (D.C. Cir. 1966).

Consequently, the standard which the juvenile court must apply is not a standard of what facilities are *actually* available in the State of West Virginia for the treatment of juvenile status offenders, but rather a standard which looks to what facilities *could reasonably be made* available in an enlightened and humane state solicitous

of the welfare of its children but also mindful of other demands upon the State budget for humanitarian purposes. We recognize that problems may arise, as for example, when a court is located in a rural part of West Virginia which lacks child-care facilities, and the court has no place to send a status offender except a correctional facility. Nevertheless, in such cases, if rehabilitation of the status offender could be accomplished by his commitment to a well-run, centralized state residential treatment center, or a local shelter facility where a small number of children live with professionally trained house parents, or by any other reasonable method, then the juvenile judge, as a matter of state constitutional law, must make a disposition under *Code* 49-5-11 (1975) which does not involve commitment to a secure, prison-like facility, or he must discharge the defendant.

For the foregoing reasons the writ of habeas corpus for which the petitioner prays is awarded and it is ordered that the petitioner be discharged forthwith from custody and restored to his liberty. Children currently committed to State facilities in violation of the guidelines enunciated in this opinion may bring actions in habeas corpus in the local circuit courts. It is further ordered that the Clerk of this Court shall send three copies of this opinion to the superintendents of each and every correctional facility in which juvenile offenders are committed together with an order of this court that those copies be posted in conspicuous places.

*Writ awarded.*