STATE *ex rel.* C. A. H.

*v.*

HON. ELMER D. STRICKLER, *Judge*

(No. 14210)

Decided January 23, 1979.

*J. M. Tully* for relator.

*Chauncey H. Browning*, Attorney General, *Richard E. Hardison*, Deputy Attorney General, for respondent.

McGRAW, JUSTICE:

In this prohibition proceeding this Court issued a show cause order on June 12, 1978[1] for the purpose of considering whether the Circuit Court of Nicholas County exceeded its lawful jurisdiction under *State ex rel. Harris v. Calendine*, ____ W. Va. ____, 233 S.E.2d 318 (1977), by committing the relator, a juvenile status offender, to the West Virginia Industrial Home for Girls at Salem, a secure prison-like facility housing exclusively juveniles adjudicated delinquent for committing crimi-

_____

[1] Contemporaneous with the issuance of the rule, this Court ordered relator be placed in the Elkins Children's Home or a comparable facility pending a decision in this case.

nal offenses. We hold the trial court exceeded its lawful jurisdiction and award the writ.

The salient facts are not in dispute, and the procedural history of the case can be briefly summarized. Following adversary proceedings on a juvenile delinquency petition, the relator was adjudicated a delinquent child under W.Va. Code, 49-1-4 [1977]. The juvenile court found the relator guilty of the charge of habitual truancy, of the charge of being a habitual runaway, and of the charge of being unmanageable, ungovernable, and incorrigible. On April 7, 1978, after receiving a social report prepared by the juvenile probation officer and a psychological evaluation prepared by a psychologist employed at a county mental health facility, the court below ordered relator committed to the West Virginia Industrial Home for Girls at Salem.

The probation officer's report explored the disposition alternatives contained in W.Va. Code, 49-5-13 [1977], and recommended the relator be committed to the most restrictive alternative, an industrial home, based on (1) the relator's prior history;[2] (2) statements from child welfare authorities that there were no foster homes or other welfare agency programs capable of rehabilitating a juvenile who refuses all help, who will not admit to having problems, and who habitually runs away; and (3) a conclusion that confinement and continuous planning and counseling were necessary. The psychological report indicated that removal from the home and a more structured environment were mandatory to an effective treatment program.

On April 7, 1978, based on the entire record, including the court's experience with relator, the court found that

[2] In the months preceding the instant delinquency petition, two petitions were filed resulting in relator being twice instructed by the juvenile court judge to obey her parents and attend school regularly. In neither case did relator comply or modify her behavior. At the detention hearing on the third petition, the relator promised to obey her parents and attend school and again was released to her parents' custody pending the preliminary hearing. Again, relator's subsequent conduct was less than satisfactory.

no less restrictive dispositional alternative contained in W.Va. Code, 49-5-13 [1977] would help relator and that relator was so totally unmanageable that no treatment facility or alternative was available in this state to take care of her problem to which she would be amenable. Upon that finding, and upon the finding that the West Virginia Industrial Home for Girls at Salem was the only alternative available, the relator was ordered committed there until she could be "transferred to any other secure institution that the state may make available for children like her in the future."

Upon motion of relator's counsel that order was stayed to enable counsel to obtain a ruling on a Writ of Prohibition by this Court, and relator was remanded to a juvenile detention facility for a reasonable time pending further development in this case.

After this Court issued the show cause order, the respondent was granted a continuance, depositions were taken, and on August 31, 1978, respondent filed an answer and return denying that the West Virginia Industrial Home for Girls at Salem is a secure prison-like facility under this Court's pronouncement in *Calendine, supra,* and denying that the circuit court exceeded its legitimate juvenile jurisdiction.

## I

Preliminarily, we hold that the West Virginia Industrial Home for Girls at Salem is a secure prison-like facility. In *Calendine, supra,* at ___, 233 S.E.2d at 325, this Court established the criteria for determining whether an institution is a secure prison-like facility:

> [W]e are not impressed with euphemistic titles used to disguise what are in fact secure, prison-like facilities. [footnote omitted]. We define a secure, prison-like facility, regardless of whether it be called a "home for girls," "industrial school," "forestry camp," "children's shelter," "orphanage," or other imaginative name, as a place which relies for control of children upon locked

rooms, locked buildings, guards, physical restraint, regimentation and corporal punishment.

The depositions of state authorities having responsibilities relating to juvenile delinquents compel the conclusion that the institution is a secure prison-like facility by revealing that all the factors enumerated in *Calendine* are features of confinement at Salem with the exception of corporal punishment. The principal security measures consist of a locked front door and some sixteen correctional officers for the approximately twenty-two residents. A more detailed discription of the physical facilities, security measures, and treatment program is not warranted. This point was not addressed in the respondent's brief and apparently was abandoned. In any event, the argument is without merit.

## II

The question presented in this proceeding is resolved and controlled by our decision in *Calendine*. There we upheld the constitutional validity of West Virginia's juvenile delinquency statutes and established definitive guidelines to guarantee that such statutes would not be unconstitutionally applied to deny juvenile status offenders equal protection, substantive due process or to inflict cruel and unusual punishment.

The fourth syllabus point of *Calendine* mandates that we award the writ of prohibition and thereby preclude the relator's commitment to Salem. Our holding was that, "Under no circumstances can a child adjudged delinquent because of a status offense, i.e., an act which if committed by an adult would not be a crime, be incarcerated in a secure, prison-like facility with children adjudged delinquent because of criminal activity."

Salem is the only correctional facility currently available in this state for the commitment of female non-status offenders. Consistent with our holding in *Calendine* and recent legislative action, there are no status offenders confined at Salem at this time. Most of its residents have been adjudicated delinquent for the com-

mission of criminal acts such as assault and battery, grand larceny, and car theft with an average stay of eight to ten months.

The practical problem confronting all institutions and groups working with habitual runaways is that there is no secure detention facility or rehabilitation facility in West Virginia devoted exclusively to the rehabilitation of status offenders. The absence of such facility, however, does not justify the violation of constitutional rights.

We placed particular importance on this point in *Calendine, supra* at ____, 233 S.E.2d at 331:

> No status offender ... may be incarcerated in a secure, prison-like facility which is not devoted exclusively to the custody and rehabilitation of status offenders. We emphasize here that State parismony is no defense to an allegation of deprivation of constitutional rights. The State may not punish a person not deserving of punishment merely because such action serves the State's interest in convenience of frugality. (citations omitted).

We are firmly committed to the constitutional principle now embodied in statutory form,[3] that status offenders are never to be confined with non-status offenders.

---

[3] W.Va. Code, 49-5-16(a) states in pertinent part:

A child charged with or found to be a delinquent solely under subdivision (3), (4) or (5), section four [§ 49-1-4], article one of this chapter, shall not be housed in a detention or other facility wherein persons are detained for criminal offenses or for delinquency involving offenses which would be crimes if committed by an adult. ...

W.Va. Code, 49-1-4 [1978] defines a delinquent child as a child:

(3) Who, without just cause, habitually and continually refuses to respond to the lawful supervision by such child's parents, guardian or custodian;

(4) Who is habitually absent from school without good cause; or

(5) Who willfully violates a condition of a probation order or a contempt order of any court.

*See also* W.Va. Code, 49-5-13(b)(6)[1978]. These 1978 amendments were passed March 11, 1978, and became effective ninety days from passage.

In addition, we held in syllabus point 6 of *Calendine:*

> No child adjudged delinquent for a status offense may be incarcerated in a secure, prison-like facility devoted exclusively to status offenders unless the record supports a specific finding by the juvenile court that the child is so ungovernable or anti-social that no other reasonable alternative exists, or with due care and diligence on the part of the State could exist, to physical restraint such as only a secure prison-like facility can provide. The proper test in this regard is not what reasonable alternatives are actually afforded by the State but rather what reasonable alternatives could be afforded by a humane and enlightened state, solicitous of the welfare of its children.

Partly as a result of the numerous alternatives to incarceration for status offenders, we also held in *Calendine* at ____, 233 S.E.2d at 329 that "the State must exhaust every reasonable alternative to incarceration before committing a status offender to a secure, prison-like facility."

The role of juvenile counsel in the juvenile justice system should be mentioned. Much like the role of defense counsel at the sentencing stage in an adult criminal case,[4] the function of counsel at the dispositional phase of a juvenile proceeding is critically important. Since most juvenile cases are resolved by guilty pleas, it is clear for most adjudicated delinquents that the dispositional stage is the most critical stage of all. W.Va. Code, 49-5-13(b) [1978][5] provides for a dispositional hearing where all parties are to be afforded an opportunity to be heard. At this stage counsel must be an advocate for that which is in the best interest of the child.

---

[4] ABA, *Standards for Criminal Justice: The Defense Function* § 8.0 (1971).

[5] That provision states in part:

Following the adjudication, the court shall conduct its dispositional proceeding, giving all parties an opportunity to be heard.

Under that subsection, the juvenile court is required to "give precedence to the least restrictive" of the enumerated dispositional alternatives consistent with the best interests and welfare of the public and the child. In preparation for the dispositional hearing, the court and all counsel should explore and become knowledgeable of all possible community resources available to the juvenile court in an effort to find the least restrictive dispositional alternative having reasonable prospects for successful rehabilitation. The activities of counsel in developing an appropriate corrective plan for a delinquent youngster are limited only by the imagination of counsel.

The extent to which alternatives to confinement are available to serve status offenders is on the increase. In a position paper filed by West Virginia State Advisory Group,[6] a planning committee created pursuant to the Juvenile Justice and Delinquency Prevention Act of 1974, 42 U.S.C. § 5601, *et seq.* (1971) we are informed that the State has been awarded a grant of five hundred and twelve thousand dollars ($512,000) for juvenile delinquency programs,[7] the most significant part of which is allocated to Treatment Homes for Juveniles and for Day Treatment. Group homes or group care centers provide an alternative to institutionalization and allow for a diversion of juveniles from the traditional justice system. There are approximately twenty-six such facilities currently operating in this state with a capacity of han-

---

[6] This paper is not a part of the record in this case, and reference to its contents is solely for edification of the bench and the bar.

[7] A major objective of the Juvenile Justice and Delinquency Prevention Act, Public Law 93-415, 42 U.S.C. § 5601 *et seq.* (1971) enacted by Congress in 1974, is to divert juveniles from the traditional juvenile justice system and to provide alternatives to institutionalization. This enactment conditions eligibility for delinquency prevention monies on the submission of a state plan which guarantees that within three years after the submission of the initial plan "juveniles who are charged with or who have committed offenses that would not be criminal if committed by an adult or such non-offenders as dependent or neglected children, shall not be placed in a juvenile detention or correctional facilities." 42 U.S.C. § 5633(a)(12) (1971).

dling five hundred and sixteen (516) juveniles. All these homes, licensed and regulated under Chapter 49 of the W.Va. Code, *et seq.*, accept status offenders for treatment yet these facilities are currently operating at only approximately one-half of licensed capacity. Day treatment consists generally of programs and activities for the child during the day while the child resides in the home or in a foster home.

For the foregoing reasons, the writ of prohibition is awarded.

*Writer awarded.* 