STATE *ex rel.* D. D. H., *et al.*

*v.*

THE HONORABLE PIERRE E. DOSTERT, *Judge, etc.,*

BRENDA CASTEEL, *Supt., etc., et al.*

(No. 14602)

STATE *ex rel.* D. D. H., *et al.*

*v.*

THE HONORABLE PIERRE DOSTERT, *Judge, etc., et al.*

(No. 14603)

STATE OF WEST VIRGINIA

*v.*

D. D. H.

(No. 14769)

Decided July 15, 1980.

Dissenting opinion July 16, 1980.

450

*J. Wendell Reed, Thomas W. Steptoe, Jr., Avey, Steptoe, Perry & Van Metre,* for relators and plaintiff in error.

*Chauncey H. Browning,* Attorney General, *Joseph C. Cometti,* Assistant Attorney General, *Richard L. Withers,* Special Assistant Attorney General, for respondents and defendant in error.

NEELY, CHIEF JUSTICE:

In this case we shall endeavor, with some apprehension, to clarify the proper procedures at the dispositional stage of a juvenile proceeding. The facts of these three consolidated cases[1] provide an excellent opportunity to explore the nature of the juvenile disposition. Indeed this particular child's journey into the juvenile justice system constitutes a veritable primer on how a juvenile should *not* be handled by the courts under either our prior rulings or the applicable sections of Chapter 49 of the *W.Va. Code.*

On 25 April 1979, a delinquency petition was filed against petitioner, then a twelve-year-old female, charging her with four crimes that would be felonies had they been committed by an adult. A detention hearing was held on 27 April 1979, after which the court ordered petitioner detained at the Jefferson County Juvenile Detention Center, a section of the county jail that is reserved for juvenile offenders.[2] On that same day, the

---

[1] The three consolidated cases are: 14602, a habeas corpus requesting that petitioner be removed from the Industrial Home for Girls which was issued by the Court 3 August 1979 releasing petitioner from Salem and directing her placement in the Odyssey Group Home in Morgantown or some other comparable facility; 14603, a writ of prohibition against Judge Pierre Dostert for his contempt proceeding against appointed counsel and removal of appointed counsel, J. Wendell Reed; and, 14769, an appeal from the adjudication and disposition of petitioner. While we draw on all the material presented to this Court in writing this opinion, our decision on the appeal, 14769, is dispositive of all the issues raised in each case with the exception of the writ of prohibition which we grant.

[2] Petitioner devoted a major portion of her argument to her detention in a common county jail for a combined period of almost 40 days. Petitioner would have us reverse the disposition on this basis

court appointed J. Wendell Reed to represent the petitioner.

While in detention, a preliminary hearing was held 3 May 1979 at which two counts of the petition were dismissed and probable cause was found on the other two, namely, breaking and entering an A & P store on 20 February 1979 and grand larceny of a pickup truck on 14 April 1979. Petitioner was subsequently released into the custody of her mother, but when she missed school she was returned to the detention center without a hearing. Counsel obtained her release two days later. On 12 June 1979 petitioner was again arrested for allegedly stealing an automobile, and she was detained in the Morgan County Jail, forty miles from her home. There is no record or hearing from that detention, save the summary order which included no findings of fact.

While we will focus upon the dispositional phase of the juvenile proceeding *sub judice*, we must first address the numerous errors committed at the adjudicatory stage. A formal juvenile petition was prepared which charged petitioner with delinquency for having committed grand larceny of a pickup truck and breaking and entering of an A & P store. On 15 June 1979, an adjudicatory hearing was held and petitioner was found delinquent on both counts. We must reverse this case because neither count was supported by sufficient, admissible evidence to sustain the charges.

The evidence in the grand larceny charge indicated that a friend of petitioner had actually taken the truck, but that petitioner had been identified as the driver

---

alone for the court's blatant denial of the mandate in our law that juveniles are not to be housed in common county jails as set forth in *State ex rel. R.C.F. v. Wilt,* ___ W.Va. ___, 252 S.E.2d 168 (1979); however, we have chosen to reverse on the errors at trial. We condemn the actions of the circuit court in housing the juvenile in a common county jail and reserve the right to reverse for this illegality in the future. We note that under *W.Va. Code,* 49-2-16 [1980], "[t]he state department of welfare shall provide care in special boarding homes for children needing detention pending disposition by a court having juvenile jurisdiction . . . ."

shortly before the truck was recovered less than a block from where it had originally been taken. Such a finding does not support one of the requisite elements of grand larceny required in *State v. Bailey*, 159 W.Va. 167, 220 S.E.2d 432 (1975), namely, that the taking away was done "with the intent to deprive the owner of his property permanently." A juvenile is entitled to the same standard of proof as an adult: beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Thus, with no direct or circumstantial evidence that she intended permanently to deprive the owner of the property, the conviction for grand larceny cannot stand. While the petitioner could have been convicted of joyriding under the evidence presented at the hearing, the petition did not assign joyriding as one of the grounds for delinquency. Under syl. pt. 6 of *State v. Bailey*, *supra*, the Court has held:

> The offense of joyriding, as defined by W.Va. Code, 17A-8-4, as amended, is not a lesser included offense of grand larceny.

Consequently, as the concurring and dissenting opinion in *State v. Bailey* pointed out, ". . . the State must elect between the two offenses when seeking an indictment, and evidence of joyriding would be an absolute defense to grand larceny while, ridiculously enough, grand larceny would be an absolute defense to joyriding. . . ." As illogical as the Court now finds the majority opinion in *State v. Bailey* with regard to its holding in syl. pt. 6, that was the law in West Virginia at the time that the petitioner was prosecuted and she is entitled to its benefit. Accordingly, the adjudication of delinquency for grand larceny must be reversed. However, we take this occasion to overrule syl. pt. 6 of *State v. Bailey*. Joyriding is obviously a lesser included offense of grand larceny of an automobile.

The delinquency adjudication for the breaking and entering of the A & P store must also be reversed because the evidence presented at the adjudicatory hearing was illegally obtained. On 20 February 1979, a glass door was broken out of the A & P store in Charles Town, West

Virginia. Upon investigation, an employee of the A & P found meat wrappers and cigarettes strewn around the building, but no inventory was made to determine exactly what was missing. The only evidence linking petitioner with the breaking and entering was the testimony of her aunt, ___ ___, that she had overheard petitioner and a friend discussing the act. On the basis of an anonymous tip that was later determined to have been given by petitioner's aunt, petitioner and a friend were picked up around 11:00 p.m. on 25 February 1979 and detained until approximately 3:00 a.m. without notice to or the presence of parents or counsel. The statements made by the children during this detention were declared inadmissible; however, it was those statements which led to Mrs. ___ ___ who provided the only evidence against the petitioner. Since the initial statements of the children were illegally obtained, the subsequent information received from Mrs. ___ ___ was inadmissible, derivative evidence. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Consequently, we must reverse and remand for a new trial the adjudication of delinquency based upon the breaking and entering of the A & P store since tainted evidence was improperly introduced.

Having determined that the delinquency conviction must be reversed, we turn to the dispositional stage of the proceeding so that upon remand a proper record can be made. Petitioner, who was thirteen years old at the time of the disposition and had never been adjudicated delinquent, was committed to the most restrictive alternative available, the Industrial Home for Girls in Salem, West Virginia. At the dispositional hearing, which was held 5 July 1979, the court relied primarily on the testimony of a social worker for the Department of Welfare, Joseph Corbin, who recommended that the petitioner be placed in the West Virginia Industrial School. He testified that he contacted two other less restrictive alternatives, namely, the Burlington United Methodist Home for Children and Youth, and Davis-Stuart, Inc., both of which refused to accept petitioner. Upon cross-examination, it became clear that counsel for petitioner had sug-

gested the Odyssey House, a group home in Morgantown, to Mr. Corbin, but that he had not pursued that possibility because he was unfamiliar with the facility. Testimony was also received from a police officer, Raymond Burcker, who said that he had seen the petitioner out late at night standing outside a bar on at least two occasions. Petitioner's mother appeared as a witness, and she testified that she had been very sick during the past year and that she had sought the aid of the Welfare Department to place petitioner in a foster home. Apparently the Welfare Department did not respond.[3]

The court relied upon the recommendation of Dr. Bradley Soulé that petitioner "has a lot more potential to develop were she in a more highly structured environment than she has been in the past." While concluding that she had an extremely chaotic family life and a number of behavioral problems such as truancy, car theft, and drug abuse, Dr. Soulé also found petitioner to be "alert, articulate, behaviorally appropriate, and ... cooperative ... throughout the interview." The recommendation for a structured environment[4] was seconded

---

[3] The Department of Welfare has been clearly assigned the responsibility of providing care, support and protective services for children who are in need of public service under *W.Va. Code*, 49-2-16 [1980]. Under *W.Va. Code*, 49-5B-4 [1979] the Welfare Department has been directed to establish programs and services designed to prevent future juvenile delinquency. Denying the request of petitioner's mother to have petitioner placed under temporary care does not comply with the goal of diverting juveniles from the juvenile justice system.

[4] We have previously voiced grave reservations about the rehabilitative programs available at the West Virginia Industrial School for Boys (known as "Pruntytown") and have recommended that "incarceration of young people in the school should be limited to those who will clearly benefit from institutionalization or to those who are dangerous to themselves or others," *State ex rel. K.W. v. Werner*, 161 W.Va. 192, 242 S.E.2d 907 (1978). We have not been presented with a record of the industrial schools that "demonstrate[s] in detail the abuses and inadequacies," as Justice Miller recognized in his concurring opinion in *Werner, supra* at 917; however, we heard discussion about dispositional alternatives during an extraordinary proceeding held on 4 June 1980. That discussion was similar to a "Brandeis Brief" in that it provided background

by Dr. Roberts, a clinical psychologist who tested petitioner.

The Court also considered the report on petitioner completed by the social service worker, Joseph Corbin. He reported that: petitioner's home should have been condemned as unfit for human habitation; petitioner's mother had been hospitalized for several weeks during the winter of 1979 with cervical cancer; petitioner's stepfather deserted the family as soon as the medical problem appeared; petitioner's stepfather had a drinking and drug problem which prompted him physically to abuse the petitioner; petitioner's father deserted her mother three weeks after petitioner was born; petitioner's mother had been a welfare client since D.D.H. was born; and, although petitioner had missed over 100 days of school her only major behavioral problem was stealing on one occasion.

## I.

At the outset it is important to recognize that the juvenile law in West Virginia has been in substantial turmoil since this Court's decision in *State ex rel. Harris v. Calendine*, 160 W.Va. 172, 233 S.E.2d 318 (1977) which, among other things, prompted an entire revision of the statutory juvenile law.[5] Historically, protecting society from juvenile delinquency and helping juvenile offenders modify their behavior have been seen as complementary goals of the juvenile law; however, it is now generally recognized that caring for the juvenile and controlling the juvenile are often quite contradictory processes.[6] Much of our juvenile law at the moment is

information. Our reservations about available rehabilitation are not based on a study of our State facilities, but rather on a study of national authorities on juvenile justice which are discussed, *infra*.

[5] The Legislature has substantially rewritten the juvenile *Code* section every year since 1977 until this year (1980).

[6] Justice Fortas expressed skepticism about attaining these twin goals and suggested that, "[t]here is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for

predicated upon a healthy skepticism about the capacity of the State and its agents to help children when they are incarcerated in one of the juvenile detention facilities.[7] Thus, the control of juveniles and the treatment of juveniles (if that expression can be used without conjuring Kafkaesque images) are frequently irreconcilable goals. Furthermore, children can be dangerous, destructive, abusive, and otherwise thoroughly anti-social, which prompts an entirely understandable expectation in society of protection, even if we have matured beyond expecting retribution.

The dispositional stage of a juvenile proceeding is designed to do something which is almost impossible, namely, to reconcile: (1) society's interest in being protected from dangerous and disruptive children; (2) society's interest in nurturing its children in such a way that they will be productive and successful adults; (3) society's interest in providing a deterrent to other children who, but for the specter of the juvenile law, would themselves become disruptive and unamenable to adult

---

children." *Kent v. United States*, 383 U.S. 541, 556, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966). Many others have recognized the difficulty in maintaining this Janus-faced role. *See, e.g.,* V. C. Streib, *Juvenile Justice in America* 51 (1978).

[7] The cry for reform in the juvenile justice area has been growing louder over the past fifteen years. Edwin M. Lemert, writing for the Task Force in Delinquency in 1967, first argued that the grandiose models of the juvenile court should be brought into a more practical perspective. He argued that, "if there is a defensible philosophy for the juvenile court it is one of nonintervention. It is properly an agency of last resort for children, holding to a doctrine analogous to that of appeal courts which require that all other remedies be exhausted before a case will be considered." Task Force on Delinquency, President's Commission on Law Enforcement and Administration of Justice, U.S. Government Printing Office 96 (1967). His recommendation has been followed by a number of commentators arguing for nonintervention. *See, e.g.,* V. L. Streib, *Juvenile Justice in America* (1978); Marticorena, "Take My Child, Please--A Plea for Radical Nonintervention," 6 Pepperdine L. Rev. 639 (1978-79); and, Chase, "Questioning the Juvenile Commitment: Some Notes on Method and Consequences," 8 Ind. L. Rev. 373 (1974-75).

control; (4) the citizens' demand that children be responsible for invasion of personal rights; and, (5) the setting of an example of care, love, and forgiveness by the engines of the state in the hope that such qualities will be emulated by the subject children.[8] While retribution is

[8] Many states have been wrestling with some statutory reconciliation of these competing goals. In this regard it is interesting to compare the 1977 amendment to *W. Va. Code*, 49-1-1(a), the purpose clause for the child welfare chapter, with the 1978 amendment to the same section. The difference is subtle, but it demonstrates a recognition that child welfare cannot be completely "child centered." *W. Va. Code*, 49-1-1(a) [1977] says:

The purpose of this chapter is to provide a comprehensive system of child welfare throughout the state which will assure to each child such care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental and physical welfare of the child; preserve and strengthen the child's family ties whenever possible with recognition to the fundamental rights of parenthood and with recognition of the state's responsibility to assist the family in providing the necessary education and training and protect the welfare of the general public. In pursuit of these goals it is the intention of the Legislature to provide for removing the child from the custody of parents only when the child's welfare or the safety and protection of the public cannot be adequately safeguarded without removal; and, when the child has to be removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents, consistent with the child's best interests.

*W.Va. Code*, 49-1-1(a) [1978] says:

The purpose of this chapter is to provide a comprehensive system of child welfare throughout the State which will assure to each child such care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental and physical welfare of the child; preserve and strengthen the child's family ties whenever possible with recognition to the fundamental rights of parenthood and with recognition of the state's responsibility to assist the family in providing the necessary education and training *and to reduce the rate of juvenile delinquency and to provide a system for the rehabilitation or detention of juvenile delinquents and protect the welfare of the general public.* In pursuit of these goals it is the intention of the legislature to provide for removing the child from the custody of parents only when the child's welfare or the safety and protection of the public cannot be adequately safeguarded without removal; and, when the child has to be removed from

considered an unhealthy instinct and, conceivably, an immoral instinct in an enlightened society, nonetheless, State imposed retribution has historically been the *quid pro quo* of the State's monopoly of force and its proscription of individual retribution. Retribution is merely another way of saying that children are to be treated as responsible moral agents.

## II.

It is possible to make the dispositional stage of a juvenile proceeding so burdensome in requiring exhaustive examination of all "less restrictive alternatives," no matter how speculative, that we, in effect, direct lower courts to abandon all hope of confining a child.[9] That is not the clear purport, however, of *W.Va. Code*, 49-5-13(b) [1978] which says:

> In disposition the court shall not be limited to the relief sought in the petition and shall give precedence to the least restrictive of the following alternatives *consistent with the best interests and welfare of the public and the child* ....
> [Emphasis supplied by the Court.]

*W.Va. Code*, 49-5-13(b)(5) [1978] says:

> Upon a finding that no less restrictive alternative would accomplish the requisite rehabilitation of the child, and upon an adjudication of delinquency pursuant to subdivision (1), section

---

his own family, to secure for him custody, care and discipline *consistent with the child's best interests and other goals herein set out.* [Emphasis supplied by the Court]

[9] Our Court has recently examined the procedures that must be followed before a juvenile may be properly committed to a juvenile correctional facility in *State ex rel. S.J.C. v. Fox*, ___ W.Va. ___, 268 S.E.2d 56 (1980). We followed the same procedure established in *State ex rel. E.D. v. Aldredge*, ___ W.Va. ___, 245 S.E.2d 849 (1978) which required that the court set forth a finding on the record that no less restrictive alternative was available before a transfer to criminal jurisdiction could be effected. *Fox, supra* analyzes all our previous dispositional decisions; however, none of the decisions discussed the philosophical underpinnings of the dispositional stage of the juvenile proceeding.

four [§ 49-1-4], article one of this chapter, commit the child to an industrial home or correctional institution for children. Commitments shall not exceed the maximum term for which an adult could have been sentenced for the same offense, with discretion as to discharge to rest with the director of the institution, who may release the child and return him to the court for further disposition; ....

As David Dudley Field, author of the *Field Code*, once pointed out, substantive law can be "gradually secreted in the interstices of procedure." Consequently, it is important to explain exactly what the elaborate procedure at the dispositional stage is designed to do. Unless there are clear, understandable standards, procedure becomes confounding at best and disguised legislation at worst.

Chapter 49 of the *W.Va. Code* covering child welfare is clearly committed to the rehabilitative model. As we noted in *State ex rel. Harris v. Calendine*, 160 W.Va. 172, 233 S.E.2d 318, 325 (1977),

The Legislature could choose to punish children guilty of criminal conduct in the same manner as it punishes adults, but as a matter of public policy the Legislature provided instead for a comprehensive system of child welfare. The aim of this system is to protect and rehabilitate children, not to punish them.

The rehabilitative model requires a great deal of information about the child at the dispositional hearing. Much of that information must necessarily focus on the critical issue of whether it is *possible* for the State or other social service agencies to help the child. Although helping the child is the first concern of the juvenile law, it is not the only concern, since at the *operational* rather than *theoretical* level, the rehabilitative approach has dramatic limitations, preeminent among which is that it interferes both with the deterrence of other children and the protection of society. While *Code*, 49-5-13(b) explicitly recognizes this problem, we have not yet refined an approach which intelligently uses procedure to arrive

at sufficient information to permit a balancing of the child's liberty interest with society's need for protection and deterrence.

## III

There is no alternative in our efforts to reconcile the competing goals of the juvenile justice system but to enter reluctantly into a brief discussion of the age-old philosophical controversy about free will and determinism.[10] Neither this Court nor anyone else in the world will ever definitively answer the question of whether mankind is determined or is possessed of free will. The philosophy of the law has generally accepted that at times people are determined while at other times they have free will. Pragmatically our legal tradition has answered the question by rules which recognize that men are guided entirely neither by external forces nor by free will; every person is influenced by both but is never totally controlled by either.

As perplexing as the philosophical argument over free will versus determinism may be, no single concept is as critical to the dispositional stage of a juvenile proceeding. The facts of the case before us clearly show a child whose sorrows are largely the result of external forces.[11]

---

[10] The U.S. Supreme Court has steered clear of this controversy and only Justice White is on record for acknowledging that, "[f]or the most part, the juvenile justice system rests on more deterministic assumptions. Reprehensible acts by juveniles are not deemed the consequence of mature and malevolent choice but of environmental pressures (or lack of them) or of other forces beyond their control. Hence the state legislative judgment not to stigmatize the juvenile delinquent by branding him a criminal; his conduct is not deemed so blameworthy that punishment is required to deter him or others." *McKeiver v. Pennsylvania,* 403 U.S. 528, 551-52, 91 S.Ct. 1976, 1989, 29 L.Ed.2d 647 (1970).

[11] A determinist pattern is evident in testimony about the petitioner offered by Sandra Lucht, Jefferson County School Board psychologist:

I have a feeling along the lines of her social maladjustment having not been caused by serious emotional disturbance but being caused by the conditions under which she had lived, modeling of her environment and her mother and people around her, her friends and I believe she is probably acting in

That she is difficult, ungovernable, and unmanageable is not disputed in the elaborate record before us, yet she was to the social forces around her the "wingless fly in the hands of small boys." On the other hand, hypothetically, we can envisage a child from a perfect middle class background, selling drugs to other children for no apparent reason other than the allure of enormous profits. To speculate that deep inside that child's psyche there is some hidden, predetermining factor is not adequate for the "deterrent" or "responsibility" purposes of the juvenile law. Furthermore, it is a negation of our entire tradition to say that every social transgression is the result of "illness." Many a very sane and well adjusted person has found the allure of illegal profits compelling. Children can, and often do, engage in delinquent conduct for no better reason than that they prefer having money to not having money.

Some things we have enough knowledge to treat and other things we do not have enough knowledge to treat. Broken homes, uncaring parents, learning disabilities, Dickensian poverty, parental abuse, and an unhealthy environment are all things which the State, "solicitous of the welfare of its children but also mindful of other

---

a very natural way as to how she has learned to survive so when you look at all those factors and her problems and her behavior problems and her difficulty in going along with the norm set for people to act by, I have seen no evidence of what I term serious emotional disturbance which would imply to me great problem with control of emotions, some neurotic tendencies of disordering thought processes or something along the line; ....

Her home as reported by Joseph Corbin, the social worker, also paints a grim picture:

.... The complex, if not, should have been condemned several years ago as unfit for human habitation. Charles Town has shut off all city services and water to the apartments due to non-payment of bills.

As far as sanitary conditions, one goes outdoors in the weeds, which have all but taken over the area.

Not only is Mrs. ____ and her three children living in the apartment, she is also allowing her brother, ____ ____, and his female companion to reside there also.

demands upon the State budget for humanitarian purposes," *State ex rel. Harris v. Calendine*, 160 W.Va. 172, 233 S.E.2d 318, 331 (1977) can begin to cure. Where, however, no factor or factors can be isolated which we can treat, or which our over-all view of the State's role in providing social justice deems not worthy of a *treatment approach*, we must, for want of any other reasonable alternative, accept the free will model, the goals of which are deterrence and juvenile responsibility.

## IV.

At the dispositional stage of the juvenile proceeding there are a number of actors whose roles have been established by statute. The first major actor is obviously the judge who, according to *W.Va. Code*, 49-5-13(a) [1978], is entitled to request the juvenile probation officer or State department worker to make an investigation of the environment of the child and the alternative dispositions possible. The second actor is the probation officer or State department worker who must fulfill this obligation, and the third actor is the counsel for the petitioner who is entitled to review any report made by the probation officer or welfare worker seventy-two hours before the dispositional hearing. In addition there is the child and his parents, guardian, or adult relatives, and the representatives of any social service agencies, including the schools, which have been involved in the case. Since the threshold question at any dispositional hearing is whether the child is delinquent because of his own free will or for environmental reasons which society can attack directly, all of the actors in the dispositional drama should concentrate their attention initially on that one subject. Obviously this is a question which the trial judge has always answered in his own mind. However, the thrust of the formal procedural model which has been evolving is that this question be developed on the record and reasons for determining a particular disposition be articulated for appellate review. We shall now focus on the role of each major actor.

## THE ROLE OF COURT APPOINTED COUNSEL

The dispositional stage of any juvenile proceeding may be the most important stage in the entire process;[12] therefore, it is the obligation of any court appointed or retained counsel to continue active and vigorous representation of the child through that stage. We have already held that counsel has a duty to investigate all resources available to find the least restrictive alternative, *State ex rel. C.A.H. v. Strickler,* ___ W.Va. ___, 251 S.E.2d 222 (1979), and here we confirm that holding. Court appointed counsel must make an independent investigation of the child's background. Counsel should present to the court any facts which could lead the court to conclude that the child's environment is a major contributing factor to his misbehavior. In this regard counsel should investigate the child's performance in school, his family background, the level of concern and leadership on the part of his parents, the physical conditions under which the child is living, and any health problems. Counsel must also inform himself in detail about the facilities both inside and outside the State of West Virginia which are able to help children.[13]

Armed with adequate information, counsel can then present the court with all reasonable alternative dispositions to incarceration and should have taken the initial

---

[12] "Since the majority of juvenile delinquency hearings involve pleas of guilty, ... the disposition decision may be the most critical stage of all and the one most urgently requiring an advocate for the child," Skoler, "The Right to Counsel and the Role of Counsel in Juvenile Court Proceedings," 43 Ind. L. J. 558, 569 (1968).

[13] The Department of Welfare must prepare a descriptive catalogue of its juvenile programs and services at least once a year and those catalogues are to be readily available under *W.Va. Code,* 49-5B-7 [1979]. Furthermore, the West Virginia Child Care Association (WVCCA) publishes a Residential Child Care Directory which describes available services. In addition, the WVCCA maintains a Resource Center with a statewide telephone information service designed to assist social workers, agencies, lawyers and others in placing young people in the most appropriate group home or group child care agency. Their office is open Monday-Friday, 8:30 a.m.-5:00 p.m. and their telephone number is (304) 335-6211.

steps to secure the tentative acceptance of the child into those facilities. It is not sufficient to suggest upon the record as an abstract proposition that there are alternatives; it is the affirmative obligation of counsel to advise the court of the exact terms, conditions, and costs of such alternatives, whether the Department of Welfare or any other source can pay for such alternative, and under what conditions any alternative facilities would be willing to accept the child.

The faithful discharge of these duties requires substantial industry; however, appointed counsel is entitled to be compensated for his time up to the statutory limit set for the criminal charges fund. Furthermore, energetic advocacy implies that the court must accommodate an adversarial proceeding at the disposition stage. In the case at bar, the court reacted to the legitimate efforts of the appointed attorney to arrange an alternative disposition by finding him in contempt and removing him from his appointment. Such practices are obviously condemned since it is envisaged that the child shall have an advocate who will make a record.[14]

The court undermined the efforts of counsel from the outset of the trial: counsel was given approximately thirty minutes to prepare before the first detention hearing, after which petitioner was placed in the Jefferson County Jail; after counsel obtained release of petitioner she was again placed in the Jefferson County Jail for failing to attend school and counsel received no notice of the second detention hearing; after counsel obtained release of petitioner she was arrested and taken before the court who placed her in the Morgan County Jail again without notice or presence of the child's counsel and with no record save the summary order; after petitioner was adjudicated delinquent, counsel represented the willingness of the Odyssey House in Morgantown to take petitioner for a trial period but the court

---

[14] For a cogent analysis of the defense counsel's role in dispositions, *see* IJA/ABA Juvenile Justice Standards Project, Standards Relating to Juvenile Counsel for Private Parties, pp. 168-87 (1977).

refused all less restrictive alternatives; and, after placement in the Industrial Home for Girls counsel continued actively to pursue probation for petitioner to which the court reacted by withdrawing the appointment of counsel and requiring his appearance at a contempt hearing. This conduct is so unjustifiable that the State chose not even to address the validity of the contempt citation in its brief. We grant the writ of prohibition in connection with the contempt charges.

## THE ROLE OF THE PROBATION OFFICER OR WELFARE WORKER:

The probation officer or welfare worker when requested by the judge is also responsible for discovering whether there are forces which are at work upon the child which either the Department of Welfare or other social service agencies can correct. In the case before us it is obvious that the petitioner had no adult supervision whatsoever and that she was left to fend for herself in the back streets. Obviously, before incarcerating a first offender like the petitioner it would have been incumbent upon the Department of Welfare to find a suitable environment for her. The record amply demonstrates from the history of the petitioner *after* this Court released her from the industrial school, that the petitioner is a somewhat unmanageable and ungovernable child who, at the time, would not remain in a juvenile refuge.[15] Nonetheless, absent at least one predisposition incidence of flight from a reasonable alternative, it was quite improper for the court to place her in the first instance in the industrial school. Upon remand the court must focus on her level of cooperation at the time she is again considered for disposition at the remand. Syl. pt. 3, *State ex rel. S.J.C. v. Fox,* ____ W.Va. ____, 268 S.E.2d 56 (1980).

---

[15] Petitioner was placed in the Odyssey House, a group home, after her petition for a writ of habeas corpus was granted by this Court and she ran away from that placement. Evidence that is before our Court, but which was not before the circuit court, indicates that petitioner was apprehended in a stolen car on at least two other occasions after her initial disposition.

The record before us also demonstrates that the Department of Welfare did not intervene with this child upon her initial arrest, although any inquiry into her background would have disclosed at the detention hearing that she was in need of help. The appropriate time for the Department of Welfare or the juvenile probation officer to intervene is at the first sign of trouble.

## THE ROLE OF THE COURT:

It is the obligation of the court to hear all witnesses who might shed light upon the proper disposition of a child and before incarcerating a child, to find facts *upon the record* which would lead a reasonable appellate court to conclude in the words of the statute, either that "no less restrictive alternative would accomplish the requisite rehabilitation of the child . . ." or "the welfare of the public" requires incarceration. Where the court directs incarceration, he should affirmatively find upon the record either that the child's behavioral problem is not the result of social conditions beyond the child's control, but rather of an intentional failure on the part of the child to conform his actions to the law, or that the child will be dangerous if any other disposition is used, or that the child will not cooperate with any rehabilitative program absent physical restraint. Where the court concludes that simple punishment will be a more effective rehabilitative device than anything else, the conclusion is certainly legitimate and within the discretion of the trial court; nonetheless, the trial court must elaborate on the record his reasons for the conclusion.

If the proceeding is merely the last in a long series involving the same child, the court should set forth any "less restrictive alternatives" which have already been tried and the actions of the child after those alternatives were implemented. Even when the child's behavior results from environmental factors, the court may find the child to pose an imminent danger to society because he will flee from all but secure facilities and, therefore, conclude that incarceration is the only *reasonable* alternative.

The court has a duty to insure that the child's social history is reviewed intelligently so that an individualized treatment plan may be designed when appropriate. This information also insures that the disposition decision is not made simply by reference to the very misbehavior which is the ground for the juvenile proceeding. The effectiveness of treatment is disputed to say the least, and this is particularily true whenever commitment to an institution is involved. Therefore, the judge making the dispositional determination should not place a child who is not dangerous and who can be accommodated elsewhere in an institution under the guise of "treating" the child.

While in the hearing before this Court it appeared that progress has been made in providing basic education and counseling in the State's industrial schools, the fact that these schools have improved does not make them the proper place for "rehabilitation" unless it appears that the child is either dangerous or must be restrained in a secure facility in order to prevent his flight.

## THE ROLE OF THE CHILD:

When we are dealing with children between the ages of twelve and eighteen it must be recognized that no placement plan short of a secure, prison-like facility is capable of having a beneficial effect without the cooperation of the child. Therefore, it is impossible to avoid the conclusion that there is an affirmative obligation on the part of the child to cooperate.[16] Certainly one instance of a child failing to follow some Rhadamanthine ruling of a circuit court does not justify instant removal to an industrial school, but a consistent course of noncooperation, particularly when combined with a predilection to

---

[16] That, indeed, may be the single most important factor regarding petitioner. Dr. Bradley Soulé, who examined her before the dispositional proceeding, concluded that the Alternative School Program at the Eastern Panhandle Mental Health Center might have benefited petitioner greatly but that "major obstacles were foreseen in terms of D.D.H.'s cooperation with attending such a program."

commit dangerous or destructive acts does justify the court in resorting to commitment.[17] This rule must be tempered, however, by the conclusion that where the agents of the State are gross incompetents and where the treatment and rehabilitative programs prescribed for the child are unreasonable, this Court will not permit incarceration where the true fault lies with the State and not with the child.[18]

When, however, there is a consistent pattern of noncooperation which makes alternative rehabilitative programs impossible, the court should set forth the facts upon the record so that this Court will understand why the trial court concludes that there are no alternatives to placement in an institution.[19]

---

[17] Certain individuals must be punished and it is folly to think that judgments of juveniles do not serve as deterrents to at least a portion of juvenile society, not because juveniles fear rehabilitation, but because they fear punishment and incarceration. Despite all protestations to the contrary the label "juvenile delinquent" does carry stigma, and it is not always confidential. *State ex rel. Daily Mail Publishing Co. v. Smith,* 161 W.Va. 684, 248 S.E.2d 269 (1978), *aff'd.,* 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979). Certainly the movement toward a punitive philosophy has been recognized in the criminal courts, *see* J. Andenaes, *Punishment and Deterrence,* 129-151 (1974); N. Morris, *The Future of Imprisonment* (1974); and, in the juvenile field *see* Fox, "The Reform of Juvenile Justice: Children's Right to Punishment," 25 Juv. Justice 2 (1974).

[18] In *State ex rel. K.W. v. Werner,* 161 W.Va. 192, 242 S.E.2d 901, 913 (1978) we said that "[j]uveniles are *constitutionally entitled* to the least restrictive alternative treatment that is consistent with the purpose of their custody." As we noted earlier, an adequate record has not been developed to determine if petitioner and others receive adequate treatment, and therefore, we leave that issue for another day.

[19] Some states have been more specific in rewriting their purpose clauses to reflect the legislative determination that rehabilitation alone does not exhaust the purposes of the juvenile justice system. For example, California added the underlined sections to its purpose clauses:

(a)The purpose of this chapter is to secure for each minor under the jurisdiction of the juvenile court such care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the minor and the best interests of the state; *to protect the public from criminal*

## V

In reaching the conclusion that rehabilitation alone does not exhaust the goals of a juvenile disposition, and that responsibility and deterrence are also important elements in our juvenile philosophy, we have not simply embraced a conservative theory that juvenile delinquents need to be punished. Liberals and conservatives alike may find solace in this opinion because we acknowledge what has been an unspoken conclusion: our treatment looks a lot like punishment. At first glance an agreement among commentators at both philosophical poles may appear strange; however, both share the conclusion that treatment is often disguised punishment. Liberals are pleased that juvenile courts must exercise restraint in resorting to questionable "treatments" at the dispositional stage and conservatives are pleased that it has been admitted that punishment can be a viable goal of any given juvenile disposition.

While the conservatives talk about punishment as "retribution" and the cornerstone of "responsibility," the liberal, child advocates speak in terms of the "right

---

*conduct by minors; to impose on the minor a sense of responsibility for his own acts;* to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when necessary for his welfare or for the safety and protection of the public * * * and, when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents. This chapter shall be liberally construed to carry out these purposes.

(b)*The purpose of this chapter also includes the protection of the public from the consequences of criminal activity, and to such purpose probation officers, peace officers, and juvenile courts shall take into account such protection of the public in their determinations under this chapter.*
*Cal.* [Welf. & Inst.] *Code,* § 202 [1977]. (Emphasis added.)
In Virginia the old purpose clause focused solely on the welfare of the child, *Va. Code,* § 16.1-140 [1956], while the revised statute includes the purpose of "protect[ing] the community against those acts of its citizens which are harmful to others and . . . reduc[ing] the incidence of delinquent behavior." *Va. Code,* § 16.1-227 [1977].

to punishment."[20] Once the rehabilitative model is accepted, the next fight is always to show that "treatment" is often a caricature—something worthy of a story of Kafka or a Soviet mental hospital. Therefore, while the conservatives throw up their hands because they believe punishment works better than treatment, the juvenile advocates return increasingly to punishment on the grounds that punishment is much less punishing than "treatment."[21] Therefore, while our opinion in this case is hardly definitive, it is designed to give guidance concerning the factors to be developed in the record. In the final analysis, since we are dealing with a love of things irreconcilable, the successful implementation of the juvenile law must rest in the sound discretion of the trial court. A record which discloses conclusively that the trial court has considered all relevant factual material and dispositional theories will permit us to make an intelligent review, keeping in mind that discretionary, dispositional decisions of the trial courts should only be reversed where they are not supported by the evidence or are wrong as a matter of law.

Accordingly, for the reasons set forth above, the writ of habeas corpus heretofore issued is discharged as moot; the judgment of the Circuit Court of Jefferson County adjudging petitioner delinquent is reversed and the case is remanded for further proceedings consistent

---

[20] Schur, *Radical Nonintervention, Rethinking and the Delinquency Problem* (1973); H. James, *Children in Trouble—A National Scandal* (1971); Fox "The Reform of Juvenile Justice: Children's Right to Punishment, 25 Juv. Justice 2 (1974); ——, "Philosophy and the Principles of Punishment in the Juvenile Court, 8 Fam. L. Q. 373 (1974); Simpson, "Rehabilitation as the Justification of a Separate Juvenile Justice System," 64 Cal. L. Rev. 984 (1976); Marticorena, "Take My Child Please-A Plea for Radical Nonintervention," 6 Pepperdine L. Rev. 639 (1978-79).

[21] In "A Time for Skepticism," 20 *Crime & Delinq.*, 20, 22 (1974), Martin Gold asserts: "The best data at hand demonstrates that we have not yet solved the problem of the effective treatment of delinquency." *See also* "Corrections and Simple Justice," 64 J. Crim. L.C. 208, 209 (1973), and Lehman, "The Medical Model of Treatment," 18 Crime & Delinquency 204 (1972).

with this opinion; and, the writ of prohibition for which petitioner prays is awarded.

> *14602: Dismissed as moot;*
> *14603: Writ awarded, and*
> *14769: Reversed and remanded.*

McGRAW, JUSTICE, *concurring:*

While the press of business at term's end has lessened the opportunity of everyone on the court to reflect upon Justice Neely's majority opinion, I offer these comments.

While trudging through the turgid prose, I had little cause to stumble over the answers to the questions which this case presented. I am moved to comment upon the extensive dicta which could be interpreted by the unwary to foreshadow a drift by this Court toward a "punishment model" of treatment for juvenile offenders. While the majority opinion's discussion may be revealing, it should not be viewed as constituting an endorsement by this Court of all the attendant legal concepts it purportedly encompasses. I believe that characterization in terms of liberal and conservative political philosophies is inappropriate to the issues at hand. These issues do not lend themselves to simplistic partisan political analysis. Reasonable people of good will, of whatever political persuasion, desire decent, rehabilitative treatment for troubled children. Judicial opinions should not be seen as attempting to dance the razor's edge between political extremes.

In closing I observe with amusement the statement that the absence of philosophical and analytical content in this Court's prior juvenile opinions left no alternative but to enter "reluctantly" into a "brief" philosophical discussion. Historically, Mr. Justice Neely has never been reluctant to engage in philosophical discussion, and in no such discussion, has he ever been brief.