294 S.E.2d 126

**STATE ex rel. B. S., an Infant**

**v.**

**Karen HILL, Director, Russell Daugherty Status Offense Facility, et al.**

**STATE ex rel. H. E. J., an Infant**

**v.**

**Karen HILL, Director, Russell Daugherty Status Offense Facility, et al.**

**STATE ex rel. P. C., an Infant**

**v.**

**Karen HILL, Director, Russell Daugherty Status Offense Facility, et al.**

**Nos. 15469–15471.**

Supreme Court of Appeals of West Virginia.

July 1, 1982.

Paul Mones, Morgantown, for relator.

Chauncey H. Browning, Jr., Atty. Gen., and Janet F. Steele, Asst. Atty. Gen., for respondents.

George Castelle, Charleston, as Guardian.

HARSHBARGER, Justice:

B. S., a fifteen-year-old male, was incarcerated in the Russell L. Daugherty [1] Sta-

1. The Honorable Russell L. Daugherty, a Judge of the Circuit court of Cabell County, contended

tus Offense Facility at Ona, West Virginia, on December 9, 1981, for incorrigibility and truancy, status offenses. His habeas corpus petition alleged his confinement violated his statutory and constitutional rights. W.Va.Const. art. III, §§ 5 and 10; W.Va. Code, 49–5B–1 *et seq.* He objected to staff use of passive physical restraint on him, and to the State's failure to accord him the least restrictive alternative at his dispositional hearing.

■ The facility was opened in 1981, licensed by the Department of Welfare for housing status offenders, W.Va.Code, 49–5B–5. Status offenders may not be housed in secure, prisonlike facilities. Syllabus Points 4 and 5, *State ex rel. Harris v. Calendine,* 160 W.Va. 172, 233 S.E.2d 318 (1977).

W.Va.Code, 49–5B–3(7) and (8) define secure and nonsecure facilities:

(7) "Secure facility" means a facility which is designed and operated so as to ensure that all entrances and exits from such facility are under the exclusive control of the staff of such facility, whether or not the person being detained has freedom of movement within the perimeter of the facility, or which relies on locked rooms and buildings, fences or physical restraint in order to control behavior of its residents.

(8) "Nonsecure facility" means a facility not characterized by use of physically restricting construction, hardware and procedures and which provides its residents access to the surrounding community with minimal supervision.

There are no locks on residents' bedroom doors at Daugherty. The front and side doors are locked to the outside at night to prevent intruders, but residents are not locked in. Window screens have alarms that ring if removed. No fences or physical barriers surround the facility. There are only three staff persons on duty at night—one male, one female and one supervisor, and they do not control exits and entrances.

■ We find that Daugherty is a nonsecure facility, and housing status offenders therein does not violate our Constitution, statutes and case law. W.Va.Const. art. III, §§ 5 and 10; W.Va.Code, 49–5–13(b)(6); 49–5–16(a); *State ex rel. Harris v. Calendine, supra.*

The Department of Welfare has published regulations and commentaries for management of juvenile residential facilities, and we include in the margin Regulations 5.25 through 5.32 [2] which are in effect

---

with this scrivener when they both practiced law, and was a friend, and was a sensitive and wise judge. He died February 11, 1975.

2. PROBLEM MANAGEMENT
 *Limitations on Potentially Damaging Responses*
 R5.25 A residential facility shall have written, comprehensive policies and procedures regarding discipline and control, which shall be explained to all children, families, staff and placing agencies. These policies shall include measures for positive responses to appropriate behavior. (See R4.3.3)
 R5.26 A residential facility shall prohibit all cruel and unusual punishments, including, but not limited to, the following:
 R5.26.1 Punishments including any type of physical hitting or any type of physical punishment inflicted in any manner upon the body;
 R5.26.1 Physical exercises such as running laps or any performing of push-ups, when used solely as a means of punishment, except in accordance with a child's service plan when such activities are approved by a physician and carefully supervised by the facility administration;

R5.26.3 Requiring or forcing the child to take an uncomfortable position, such as squatting or bending, or requiring or forcing the child to repeat physical movements when used solely as a means of punishment;
R5.26.4 Group punishments for misbehaviors of individuals except in accordance with the facility's written policy;
R5.26.5 Punishment which subjects the child to verbal abuse, ridicule or humiliation;
R5.26.6 Excessive denial of on-grounds program services or denial of any essential program service solely for disciplinary purposes;
R5.26.7 Withholding of any meal;
R5.26.8 Denial of visiting or communication privileges with family solely as a means of punishment;
R5.26.9 Denial of sufficient sleep;
R5.26.10 Requiring the child to remain silent for long periods of time;
R5.26.11 Denial of shelter, clothing or bedding;
R5.26.12 Extensive withholding of emotional response or stimulation;
R5.26.13 Chemical, mechanical or excessive physical restraint;

at Daugherty. Its staff have been trained by Braley and Thompson, consultants, in crisis management and passive physical restraint, and in his affidavit, Braley explained passive physical restraint:

> The procedures involves (sic) two child care workers gaining control of the child's legs not the child's arm. The child is then placed on the floor on his stomach. By two staff members doing this, the risk of injury is significantly reduced. Once the child is on the floor his hands are to be placed in the small of his back at belt level. No pressure is to be applied on the child either by bending arms in a 90 degree angle or ... "putting pressure behind the individual's knees".

■ We understand that status offenders may occasionally lose control in even a most attentive environment. In *State ex rel. K. W. v. Werner*, 161 W.Va. 192, 242 S.E.2d 907, 916 (1978), we permitted occasional incidents of solitary confinement for a juvenile offender, "but only in instances when physical restraint and isolation of a juvenile are absolutely necessary to enable him to gain personal control of himself." A noninjurious, passive physical restraint carefully applied by two trained child care workers is acceptable for those times when reason and other techniques are unsuccessful.

R5.26.14 Exclusion of the child from entry to the residence;

R5.26.15 Assignment of unduly physically strenuous or harsh work.

R5.27 Children in care of a residential facility shall not punish other residents except as part of an organized therapeutic self-government program that is conducted in accordance with written policy and is supervised directly by staff.

R5.28 A residential facility shall ensure that administering of the discipline is not delegated to persons who are not known to the child.

R5.29 A residential facility shall ensure that disciplinary measures are administered as soon after the offensive behavior as possible and that these measures are reasonably related to the nature of the offense and are not excessive.

*Passive Physical Restraint*

R5.30 A residential facility shall ensure that all direct service staff members are trained in crisis management, the appropriate use of passive physical restraint methods and after

■ B. S. is entitled to another dispositional hearing because the trial court and the child's counsel did not follow procedures required by our cases and statutes. *State ex rel. R. S. v. Trent*, W.Va., 289 S.E.2d 166 (1982); *State ex rel. S. J. C. v. Fox*, 165 W.Va. 314, 268 S.E.2d 56, 58–59 (1980); Syllabus Point 3, *State ex rel. D. D. H. v. Dostert*, 165 W.Va. 448, 269 S.E.2d 401 (1980); Syllabus Point 2, *State ex rel. C. A. H. v. Strickler*, 162 W.Va. 535, 251 S.E.2d 222 (1979).

This Court has previously held that with respect to proceedings to transfer a juvenile to the criminal jurisdiction of the circuit court, the failure of the juvenile court to make express findings as required by statute renders the transfer order void. *State ex rel. E. D. v. Aldredge*, 162 W.Va. 20, 245 S.E.2d 849 (1978). *We find this principle to be equally applicable to dispositional orders.... The failure to set forth such a finding on the record deprives the court of authority to order such a commitment.* (Emphasis added.)

This is not to say that the mere recitation of the language of the statute will save an otherwise invalid dispositional order. *See State v. M. M.*, 163 W.Va. 235, 256 S.E.2d 549 (1979). As we noted above, the court must set forth on the record findings of fact which support the conclusions required by the statute. These findings should be based on evi-

management. Any use of passive, physical restraint shall be documented in the child's case record.

R5.31 A residential facility shall not use any form of restraint other than passive physical restraint without the prior approval of the regulatory body.

*Time-Out Procedures*

R5.32 A residential facility shall only use time-out procedures (forced separation from the group in a confined area) when these procedures are in accordance with written policies of the facility. These policies shall include procedures for recording each incident involving the use of time-out. Facility policies shall outline other less restrictive responses to be used prior to the use of time-out.

R5.32.1 Each use of time-out procedures shall be directly supervised by supervisory staff.

R5.32.2 The facility's chief administrative officer shall approve any use of time-out procedures exceeding 30 minutes in duration.

dence in the record which relates directly to the factors required by the statute to be considered and which sufficiently supports the conclusions of law which must be set forth. *State ex rel. S. J. C. v. Fox, supra,* 165 W.Va. at 317, 268 S.E.2d, at 59.

These requirements apply to status and nonstatus juvenile offenders. *State ex rel. R. S. v. Trent, supra; State ex rel. H. K. v. Taylor,* 169 W.Va. 639, 289 S.E.2d 673 (1982).

Transcripts of B. S.'s adjudicatory and dispositional hearings are in an appendix for our readers.

 There was no recitation of facts in the court's order or in the record, mentioning alternatives explored or reasons for their rejection; no case histories, reports, records, psychiatric, psychological, educational or social evaluations; and most importantly, no individualized treatment plan. We reiterate the requirement set forth in Syllabus Points 1, 2, 6 and 7 of *State ex rel. R. S. v. Trent, supra* :

1. W.Va.Code § 49–5–13(b) (1980 Replacement Vol.) requires the juvenile court at the dispositional stage of delinquency proceedings to "give precedence to the least restrictive" of the enumerated dispositional alternatives "consistent with the best interests and welfare of the public and the child."

2. Before ordering the incarceration of a child adjudged delinquent, the juvenile court is required to set forth upon the record the facts which lead to the conclusion that no less restrictive alternative is appropriate. The record must affirmatively show that the child's behavioral problem is not the result of social conditions beyond the child's control, but rather of an intentional failure on the part of the child to conform his actions to the law, or that the child will be dangerous if any other disposition is used, or that the child will not cooperate with any

rehabilitative program absent physical restraint.

\* \* \* \* \* \*

6. A child adjudged delinquent and committed to the custody of the State has both a constitutional and a statutory right to treatment.

7. All officers and employees of the State charged with implementing the provisions of the juvenile law are required to act in the best interests of the child and the public in establishing an individualized program of treatment for each child adjudged delinquent.

There is simply no record to enable us to determine whether incarceration in Daugherty was the least restrictive appropriate alternative for B. S.

We understand that trial judges who must deal with juveniles, often, and we believe commendably, develop a personal rapport and great concern about the children with whom they work—that they *care* about them. We understand that in this laudatory relationship, manifested by thoughtful, even tender, counselling and admonition, interruption for "making a record" is a reversion to officialdom and stark authority that may seem to jeopardize the very trust, confidence, and reliance that a good judge seeks to gain from a youngster.

But we must have those findings and conclusions.

We remand B. S. for another dispositional hearing. The record must show findings of fact, conclusions of law, an individualized treatment plan, and efforts made by all court officers and welfare department officials to arrive at a least restrictive alternative for B. S.[3]

Writ granted as moulded.

APPENDIX

DISPOSITIONAL HEARING

BY THE COURT:

---

3. We are advised that *State ex rel. H. E. J. v. Karen Hill, Director, Russell Daugherty Status Offense Facility,* No. 15470 and *State ex rel. P. C. v. Karen Hill, Director, Russell Daugherty Status Offense Facility,* No. 15471, that involved essentially the same problems as *State ex rel. B. S. v. Karen Hill, Director, Russell Daugherty Status Offense Facility,* No. 15469, are moot and need no further treatment by this Court.

Q. What is your name?

A. [B_____ S_____.]

Q. [B.], do you understand that you're charged in a petition here with truancy, having missed several days of school without excuse?

A. Yes, sir.

THE COURT: Is it true, [counsel], that he wishes to admit those charges?

[COUNSEL]: Yes, Your Honor.

Q. [B.], do you understand that you don't have to admit these charges if you don't want to?

A. Yes, sir.

Q. Okay. Did you skip school on these days?

A. Yes, sir.

Q. You didn't have any good excuse, is that right?

A. No, sir.

Q. Okay. Do you understand that you could deny these charges if you wish?

A. (Nodded in the affirmative.)

Q. And you could have a trial and a hearing before me. Do you understand all that?

A. Yes, sir.

Q. Okay. Do you really believe you're guilty of this?

A. Yes, sir.

Q. You didn't have any excuse whatsoever?

A. No.

THE COURT: [Counsel], do you believe this youngster understands his constitutional and procedural rights?

[COUNSEL]: Yes, Your Honor. I discussed these with him when I was assigned to the case originally. Yes, I do believe he understands.

THE COURT: Mrs. [S.]?

[MOTHER]: Yes.

THE COURT: Is it true that you have been having some problems with this youngster in addition to him not going to school?

[MOTHER]: Yes, I have.

THE COURT: And are you disturbed and worried about the situation?

[MOTHER]: Very disturbed, yes, sir.

THE COURT: Has he been very, very incorrigible at home and so forth?

[MOTHER]: Yes, sir, he won't mind me at all.

[COUNSEL]: Your Honor, I believe that [B.] has indicated to all of us that he might like to try a different atmosphere rather than one at home in hopes that he could straighten himself out.

Q. Is that true?

A. Yes, sir.

THE COURT: All right. Then I'm going to accept this boy's admission and determine that he is guilty. I find that he is very incorrigible and unmanageable and ungovernable and is in need of some treatment which is in a rather restrictive setting. So I'm going to place him in the custody of the Department of Welfare with the understanding that he will be committed to and placed in the Daugherty Center at Ona for a period of time not to exceed a year, and with the further understanding that his intake of food of all sorts will be logged and monitored over the first couple of weeks to see if there's any reaction to anything in that respect. And perhaps cut back some on the sugar intake, if not altogether. I'll leave that up to the staff. The staff is here and will want to talk with [B.] and his mother before he leaves. Otherwise, he'll be in the custody of the Sheriff. And take him over here across the courtroom and find a room for them, [G.], so that they can talk. And then after they've done that, then you can put him over with the—

[COUNSEL]: Your Honor, who would I contact in two to three weeks at the Center—

THE COURT: If you'd like, they'll give you the number and whoever—

[COUNSEL]: Okay.

THE COURT: Let the record show that I am not requiring a pre-disposition report in this matter. It appears that

the action taken is necessary to be taken today.